## MARY L. PRATT

*v.*

## JAMES PRATT *et al.*

*Filed at Ottawa September 25, 1880.*

1. SUBROGATION—*to lien of State for taxes.* A holder of a lien upon land has a right to purchase a certificate of the sale of the land for taxes where the time of redemption has expired, paying a reasonable sum therefor, or to redeem from the tax sale if the time of redemption has not expired, and to have the money so paid refunded. The taxes being a paramount lien to all others, a lien holder who discharges the same is entitled to be subrogated to the rights of the State, and the amount paid to extinguish such paramount lien or incumbrance will constitute a first lien on the land.

2. MORTGAGEE *pendente lite—bound by decree.* A party taking a mortgage on land pending a bill to foreclose a prior mortgage or lien, will be bound by the decree and sale made in the pending suit the same as if made a party to the bill to foreclose, and will be bound to redeem from such sale within twelve months. If he fails to do so, his equity of redemption will be barred.

3. JUNIOR MORTGAGE—*sale under prior lien.* Where a subsequent mortgagee *pendente lite* suffers the mortgaged premises to be sold on the foreclosure of a prior mortgage, and allows the time of redemption to pass, his rights under his mortgage will be extinguished and lost, and can only be revived by contract with the parties holding the title.

4. SAME—*when lien revived after it is barred.* Where a mortgage contains the words "grant, bargain and sell," which create a statutory covenant on the part of the mortgagor, and the mortgagor, after a sale under a prior lien has passed redemption except as to judgment creditors, procures a redemption through such a creditor under a written contract giving him the right to redeem upon payment of the cost of redemption, with interest, within a period of years, such agreement will revive the mortgage as to his equitable title, and the mortgage may be foreclosed, subject to the rights of the parties making the redemption.

5. CONVEYANCE—*subsequently acquired title or equity.* Under section 8 of the Conveyance act ( Rev. Stat. 1874 ) the use of the words "grant, bargain and sell," in a deed or mortgage, operates as a covenant to the grantee or mortgagee, and his heirs, etc., that the grantor or mortgagor was seized in fee simple of the land, free from all incumbrance, etc., and a subsequently acquired title by the grantor, whether legal or equitable, will inure to the benefit of the grantee or mortgagee.

6. MORTGAGE—*when revived after being barred, is prior to any subsequent charge.* Where a mortgagee contracts with a third person to redeem the

mortgaged premises after the time of redemption has passed on his part and that of his mortgagor, upon a sale under a prior lien, but for the mortgagee's benefit upon his paying the cost of the redemption, with interest, in a given time, this will operate to revive the junior mortgage, which contains the words "grant, bargain and sell," and such mortgage will take priority over any subsequent charge made upon the land by the mortgagor with the person redeeming, for further advances or payments made without the assent of the mortgagee.

7. FRAUDULENT CONVEYANCE—*presumption—of the proof required.* Where notes and a mortgage given to secure them, appear to be fair on their face, it will be presumed they are valid and binding until such presumption is overcome by clear and satisfactory proof. Mere suspicion of fraud is not enough, but it must be satisfactorily shown. The evidence must convince the understanding that the transaction was entered into for a purpose prohibited by law.

8. WITNESS—*credibility.* Where a party to a suit, upon a second trial, testifies to admissions by the other party of vital importance, and which, if true, would likely be decisive, but on his cross-examination admits that he gave no such testimony on the former trial, and gives no satisfactory explanation why he did not, this circumstance will greatly impair the force of his testimony, especially when positively denied by the other party.

9. SAME—*competency—of party to prove admissions of deceased person.* On the hearing of two suits in chancery, consolidated, in one of which the bill was filed by an administrator to foreclose a mortgage given to the intestate, and the other a creditor's bill to subject the mortgaged premises to the payment of a decree, in which the mortgage is alleged to have been given to defraud creditors, the complainant in the creditor's bill is not a competent witness to testify as to admissions of the deceased in his lifetime.

10. NOTICE—*record of mortgage.* A purchaser of land upon which there is a mortgage duly recorded at the time he buys and takes a deed, is chargeable with notice of the same, and the fact that the mortgagor told him the mortgage was satisfied will not relieve him from the consequences of such notice in the event the mortgage was not satisfied. He should have applied to the holder of the mortgage to learn the truth of the statement.

11. DECREE—*as to persons not parties.* It is error to render a decree affecting the interests of persons who are not made parties to the suit in which it is entered.

APPEAL from the Appellate Court for the Second District; the Hon. NATHANIEL J. PILLSBURY, presiding Justice, and the Hon. JOSEPH SIBLEY and HON. EDWIN S. LELAND, Justices.

This was an appeal by Mary L. Pratt from a decree rendered in the circuit court of McHenry county on a hearing before the Hon. C. W. UPTON, Judge, presiding.

On November 27, 1872, James Pratt filed a creditor's bill to subject the interest of Russell Grimes in certain lands to the payment of a certain decree in favor of Pratt against Russell Grimes, and to set aside a mortgage of said Grimes to Philemon B. Pratt, dated March 10, 1862. This bill was against Philemon B. Pratt, Jacob Grimes, Alexander Grimes, Mary L. Pratt and Langdon Miller. At the May term, 1874, the death of Philemon B. Pratt was suggested and leave granted to amend the bill, making his personal representatives parties. On October 15, 1877, the bill was amended, making Celintha Miller, wife of Langdon Miller, a party defendant.

On December 27, 1875, Langdon Miller, and Celintha Miller, his wife, filed their bill against Russell Grimes and Mary L. Pratt. Afterwards an amended bill was filed charging that Philemon B. Pratt claimed to hold some interest by mortgage or otherwise upon the land, and showing his death and the appointment of Mary L. Pratt as his administratrix, and charging that she claimed to have succeeded to such claim, and making her a party as such administratrix.

On December 30, 1876, Mary L. Pratt, as administratrix of the estate of said P. B. Pratt, deceased, filed a bill against Russell Grimes, James Pratt, Langdon Miller, Celintha Miller, John Worthington and Miles Lyon, to foreclose a mortgage given by Russell Grimes to said P. B. Pratt, dated March 10, 1862, on tracts A, B and C, and the Worthington and Lyon tracts.

These three cases, by agreement, were consolidated and tried together, and a decree entered, after a hearing on the bills, answers, replications and proofs, from which Mary L. Pratt, in her own right and as administratrix, appealed to the Appellate Court for the Second District. Mary L. Pratt brings the case to this court by appeal from the judgment of

the Appellate Court in affirming the decree of the circuit court, except so far as it related to tract D, which part of the decree was reversed and remanded.

The following appears to be a statement of the facts in brief, so far as to present the several liens and claims of the several parties:

On May 15, 1857, Russell Grimes was the owner in fee of tracts A, B and C, the Worthington tract and the Lyon tract, and on that day executed a mortgage upon all of said lands to one Hiram Barrett to secure his notes, amounting to $2560, payable in one, two, three and four years, with ten per cent interest. This mortgage was assigned to Justin S. Morrill, who, January 30, 1862, filed his bill to foreclose the same in the McHenry circuit court. A decree of sale was rendered March 26, 1862, and tracts A, B and C were sold to Morrill, May 31, 1862, for $1342.66.

Russell Grimes failed to redeem within the year, and about the first of August, 1863, an arrangement was made between Russell and Alexander Grimes and Langdon Miller for the redemption of said lands, for the benefit of Russell Grimes.

Alexander Grimes, a brother of Russell Grimes, applied to Miller for money with which to redeem the lands, and it was agreed between Alexander and Russell Grimes and Miller that Alexander Grimes should take the title and give to Mr. and Mrs. Miller (a part of the money being advanced by her) a mortgage for the sum so advanced, and a bond to Russell Grimes to convey to him, upon payment of the amount so procured from the Millers, with interest.

Miller accordingly transferred to Alexander Grimes a judgment note against Russell Grimes for $185.40, upon which judgment was entered by confession on August 25, 1863. Under this judgment, Alexander Grimes made the redemption of the lands, paying the sheriff $1509.25, which money was advanced by the Millers. The lands were levied upon and sold under an execution issued on the judgment, to Alexander Grimes, on September 26, 1863, who bid there-

for $1745.16, the amount of redemption money, judgment, costs, etc., and Alexander Grimes received a sheriff's deed therefor, dated May 10, 1864.

On May 14, 1864, Alexander Grimes gave to the Millers his note for $1740.62, payable October 1, 1866, with interest at nine per cent from October 1, 1863.

This note was for the money furnished by the Millers to redeem, and the note on which judgment was rendered, and probably some costs, and interest to October 1, 1863. To secure the note, Alexander Grimes and wife gave their mortgage upon said lands. It was also understood that Russell Grimes was to have further time to redeem said lands, if he could do so, and he remained in possession, receiving the rents and profits, until August 2, 1872. He was to pay the note given by Alexander Grimes to the Millers, upon which the latter was to let him have the land. Russell Grimes neglected to pay the note of $1740.62 to the Millers, and after the year 1866 to pay the interest thereon, or the taxes upon the lands, and one Phillips acquired a tax title thereon.

The Millers, on June 26, 1871, paid said Phillips the sum of $425 to redeem the premises from the tax sale.

In the month of April, 1871, a settlement was had between the Millers and Russell Grimes, and there was then due them for unpaid interest on said note for $1717.62 and for money paid for taxes, the sum of $2742.78, and Russell Grimes not being able to pay this sum of money, he assigned to the Millers the bond which Alexander Grimes had executed to said Russell, to convey to him said lands on his paying said Millers and some other matters. But Alexander refused to convey said lands until Russell would settle with and pay a debt which Russell owed his brother, Jacob Grimes. Thereupon, all three brothers met, Alexander, Russell and Jacob, and it was agreed between them, finally, that if the Millers would pay to said Jacob a note made by Russell and given to Jacob Grimes, dated October 20, 1870, for $771.16, and bearing ten per cent interest, Alexander Grimes should convey the land

to Russell Grimes, and he should execute and deliver to the Millers a new mortgage on the lands, including in such mortgage the original sum of $1717.62, the sum paid for taxes by them, and the said note of $771.16, and the interest due thereon. In pursuance of such arrangement, the Millers at once became the purchasers and owners of the $771.16 note, but Russell Grimes neglected to fulfill the agreement.

On July 27, 1872, the Millers filed their said bill for the purpose of enforcing the payment of the sum due them. On July 30, 1872, Russell Grimes came to the Millers, saying he had found a purchaser for the lands, and asked them to take the title to the same and put it on record. Alexander Grimes and wife then conveyed the land to the Millers, and the deed was recorded. A few days afterwards, on August 2, 1872, Russell Grimes returned, and stated that he had failed to sell as he had expected, but that he had made sale of the lands to his sister, Mary L. Pratt, and that he was authorized to act for her.

The Millers, on the faith of this, went through the form of payment as Russell Grimes requested, and made a sale of the land to Mrs. Pratt for $4080, in good faith, as they claimed, expecting she would pay them the sum due from said Russell.

The Millers insist that Russell Grimes was acting as agent for Mrs. Pratt, and that, therefore, she became liable to pay said sum of $4080, and that they have a lien on all of said lands against her. The contract of sale, it seems, was not signed by Russell Grimes, either for himself or for her, and both she and Russell deny that he had any authority to make the contract for her.

The decree of the circuit court of McHenry county,—

1st. Gave the Millers a first lien on tracts A, B and C for $6345.66.

2d. Decreed that the mortgage of Russell Grimes to Philemon B. Pratt, which covered tracts A, B and C and the south-east quarter of section 16, township 45 north, range 5

east, (town of Dunham,) now owned by Worthington, and the Worthington tract, and the west half of the north-west quarter of section 33, township 44 north, range 7, (town of Dorr,) now owned by Miles Lyon, and called the Lyon tract, was made to hinder and delay creditors of Grimes, and dismissed the bill of Mary L. Pratt, as administratrix of Philemon B. Pratt, to foreclose the same.

3d.    Decreed that a certain trust deed, given by Russell Grimes to J. B. Smith, trustee, March 10, 1862, upon tract D, to secure two notes of Grimes to Mary L. Pratt,' and a trustee's deed made by said Smith, as said trustee, to Carpenter, were wholly void, because the notes, by said trust deeds secured, were barred by the statute of limitations, and set the said trustee's deed aside.

4th.    Decreed that Russell Grimes, subject to the lien in favor of the Millers and James Pratt, was the owner of tracts A, B, C and D.

5th.    Gave James Pratt a first lien on tract D, and lien on tracts A, B and C, subject only to the lien in favor of the Millers, for the amount due on his decree.

From this decree, Mary L. Pratt, in her individual capacity, and, also, as administratrix of the estate of Philemon B. Pratt, prosecuted an appeal to the Appellate Court for the Second District, and in that court that portion of said decree relating to tract D was reversed, and the cause remanded, with direction to make Smith, the trustee, and Carpenter, the purchaser at the trustee's sale, parties, and for further proceedings.    In all other respects, the decree was affirmed.

Mr. H. B. HURD, and Mr. FRANK BAKER, for the appellant:

The notes and mortgages are *prima facie* valid, and, upon their production by the administratrix of the mortgagee, the burden of proving either that they were fraudulent and without consideration, or have since been paid, rests upon the party attacking the same.

The evidence as to alleged declarations of Russell Grimes, to the effect that the mortgage was a sham, or had been paid, while probably competent as against him, were certainly not competent in his favor, or against the holder of the notes and mortgage, and no foundation whatever was laid for the introduction of parol testimony as to the contents of the alleged release.

If such evidence is to be admitted as against the holder of a mortgage, and the mortgage set aside upon it, solemn instruments and official records are of little value.

Incompetent Evidence. While we insist that if all objections to the competency of the evidence introduced against the mortgage were waived the mortgage must stand,—we must not be understood as waiving a single objection. Mary L. Pratt, as administratrix upon her husband's estate, was a party to the bills of James Pratt and the Millers, and the sole complainant in the bill to foreclose the mortgage. James Pratt and Langdon Miller were parties in all of the causes adverse to Mary L. Pratt, and Worthington and Lyon were defendants to her bill to foreclose the mortgage, and Lampson and Carmack were directly interested in the event of the suit, having once owned and conveyed by warranty deed a portion of the mortgaged premises, and yet each and all were permitted to testify as to facts occurring before the death of Philemon B. Pratt, and to alleged admissions by him, against the most strenuous objections on the part of counsel for his administratrix, and all this evidence was clearly incompetent. Sec. 2, ch. 51, Rev. Stat. 1874, p. 488; *Connolly* v. *Dunn,* 93 Ill. 218; *Brown* v. *Hurd,* 42 id. 122; *Whitmer* v. *Rucker,* 71 id. 410; *Bœster* v. *Byrne,* id. 466.

The mortgage was not cut off by the sale under the Barrett mortgage and redemption by Alexander Grimes. That redemption having been made for Russell Grimes' benefit, with money borrowed for the purpose at his request, the legal title vested in Alexander Grimes only for the purpose of security, and Russell Grimes became reinvested with the equitable

title subject to the mortgage, and Philemon Pratt's mortgage attached thereto, to the same extent as if the land had been reconveyed to Russell Grimes, and he had executed to Langdon Miller a mortgage for the amount of the money borrowed for the purpose of making a redemption.

Where a party acquires the legal title by a purchase at a sheriff's sale of land, under execution, in pursuance of a parol agreement with the judgment debtor that he is to hold the title thus obtained as a security for a loan of money paid to relieve the land from the judgment lien, and that he will reconvey when the money is refunded, the deed will be treated as a mortgage, and the grantee of the purchaser with notice will be treated as a mortgagee. *Reigard* v. *McNeil*, 38 Ill. 400; *Smith* v. *Doyle*, 46 id. 451; *Klock* v. *Walter*, 70 id. 416; *Smith* v. *Knœbel*, 82 id. 392; *Strong* v. *Shea*, 83 id. 575; *Smith* v. *Cremer*, 71 id. 185.

As to their advances to redeem, the Millers occupy the position of first mortgagees, and the holder of the Pratt mortgage that of second mortgagee, and the rule in such cases is well settled.

A subsequent mortgagee is entitled to precedence of advances made by a prior mortgagee who has notice of the second mortgage. *Fry* v. *Bank of Illinois*, 11 Ill. 367.

Record of subsequent mortgage is notice to prior mortgagee. *Spader* v. *Lawler*, 17 Ohio, 371. Bank of Montgomery County Appeal, 36 Penn. 170; *Ladue* v. *D. & M. R. R. Co.* 13 Mich. 380.

Mr. J. H. MAYBORNE, for the appellees Langdon and Celintha Miller.

Mr. A. B. COON, and Mr. B. N. SMITH, for the appellees Worthington and Lyon.

Mr. E. K. SMITH, and Mr. E. F. ALLEN, for the appellee James Pratt:

A person purchasing real estate *pendente lite*, does it at his peril, and is as conclusively bound by the result of the

litigation, whatever it may be, as if he had been a party to it from the outset., *Inloe's Lessee* v. *Henry*, 11 Md. 524; *Salisbury* v. *Benton*, 7 Lansing, 352; *Harrington* v. *Slade*, 19 Barb. S. C. 162; 1 Story's Eq. sec. 406; *Tilton et al.* v. *Cofield et al.* U. S. Supreme Court, Oct. Term, 1876.

A court of equity has no power to create a lien, beyond the general one which follows from a decree for the payment of money. It can only recognize and enforce a lien which is created by the acts of the parties. *Dewey et al.* v. *Eckert*, 62 Ill. 218.

If Russell had no right to redeem at the time Alexander gave him the bond, then certainly no one except Alexander and the Millers could proceed against the said land, except through the means given by the bond.

We claim that she was bound under this contract to pay the Millers the amount therein specified; that the Millers were bound to convey if she paid; that "no formal language is necessary," and that "anything from which the intention of the parties may be gathered will be sufficient, and need not be signed by both parties to take it out of the Statute of Frauds." *Wood* v. *Davis*, 82 Ill. 311.

It need only be signed by party to be charged. Brown on Statute of Frauds (3d ed.) secs. 365 and 366.

Mr. JUSTICE WALKER delivered the opinion of the Court:

It is conceded by appellant that Miller and wife have a first lien on three of the tracts of land in controversy for the amount advanced by them to Alexander Grimes to redeem from the sale to Merrill under the foreclosure of Barrett's mortgage. But it is insisted that there is nothing else that is prior to Pratt's mortgage; that the sum paid to Phillips to prevent his obtaining a tax title on the land, and the note purchased by Miller and wife from Jacob Grimes on Russell Grimes, were not and could not be made prior liens to Pratt's mortgage.

As the taxes were paid to preserve the title to the land and prevent all liens from being cut off and lost, they are, of course, a prior lien. And the land having been sold to Phillips for taxes, and neither Russell nor Pratt having paid them or redeemed from the sale, Miller and wife, as lien holders, had the right to pay him a reasonable sum for an assignment of the certificate of purchase, if the time for redemption had expired, and if not, to have redeemed and to have the money refunded. The taxes were a paramount lien to all others, and when paid by any lien holder, he was, of course, subrogated to the rights of the State, etc., for the amount necessarily paid to extinguish the lien for taxes. It was as much the duty of Pratt to pay the taxes to protect his lien as for Miller and wife to preserve theirs. And hence, when paid by the Millers, that sum became a lien on the land, of the same character as that previously held by them. These were, therefore, a part of the prior liens held by the Millers, to which the Pratt mortgage became subordinate.

These lands had been sold under Barrett's prior mortgage, and had been purchased by Morrill, and twelve months for redemption had expired after the sale. But neither Russell Grimes nor P. B. Pratt had redeemed. Their right of redemption was cut off and gone. They thereby had lost all of their rights in the premises, although creditors had a right to redeem before the expiration of fifteen months. The Millers then held a note on Russell Grimes for $185, with a power of attorney to confess judgment thereon. Russell, the Millers, and Alexander Grimes thereupon entered into an agreement by which Alexander received an assignment of this note, had a judgment entered thereon, sued out execution and had it levied on the lands and redeemed from Morrill's purchase, and he became the purchaser at the sheriff's sale, and subsequently obtained a sheriff's deed.

To enable Alexander Grimes to redeem, the Millers advanced to him $1342.66, the amount of Morrill's purchase, and interest. It was then arranged that Alexander should

hold the title as security to the Millers for these advances, Russell to refund the money, with interest, to the Millers, and then have the land conveyed to him by Alexander. At about the same time, and as part of the arrangement, Alexander Grimes, on the 14th day of May, 1864, executed to Russell Grimes a written obligation to convey the lands to him on his paying $1731.48, with nine per cent interest per annum; "also, the George Allen debt—about $141." Russell Grimes was to hold possession of the premises, and apply the net proceeds on these sums annually,—the whole amount to become due three years from the first of October, 1863. As the Millers and the two Grimes made this arrangement, these are, no doubt, the sums of money then due the Millers. The Morrill purchase and the $185 note and interest thereon, no doubt made $1731.48 then due the Millers. It may be assumed this was then the full amount of all advances made by the Millers to redeem these lands from Morrill's purchase.

The obligation of Alexander Grimes to convey to the Millers, or to hold the lands for their indemnity, is not found in the transcript of the record, but its existence is not contested. The Millers and Russell Grimes came to an accounting in April, 1871, when they found that for redemption money in trust and taxes there was $2742.98 due the Millers. Russell assigned Alexander's obligation of the 14th day of May, 1864, to the Millers, and Alexander conveyed the land to them. But they were still to permit Russell to redeem.

This settlement of April, 1871, we suppose, only embraced the $185 note, the $1342.66 advanced to redeem, and interest, and it may be the money paid to prevent the title from being endangered by a tax title. It could not have embraced the money paid on the note Jacob Grimes held on Russell, as it was less than the two former sums in the nine per cent interest, and, we infer from the record, the money was paid on that note at a later date. But in August, 1872, another settlement was had, when it was found that Russell owed the Millers $4080.48, and we infer that this settlement embraced the

money paid to Jacob Grimes and the $1731.48 and interest. At this last settlement, the Millers, then holding the title to the lands by a previous conveyance from Alexander Grimes, gave to Russell an obligation to convey the lands to Mrs. Pratt on her paying to them $4080.48, with interest at the rate of ten per cent, within one year from that date.

Inasmuch as P. B. Pratt took his mortgage pending the bill to foreclose the Barrett mortgage, and under the decree in which case Morrill purchased, and, as no redemption was made from that sale within twelve months, Russell and P. B. Pratt were both actually barred of their equity of redemption. And all of the rights they subsequently acquired were by means of the arrangement and redemption by Alexander Grimes as a judgment creditor. Pratt's mortgage was as effectually barred as if he had been a defendant to that bill. But the question arises whether his mortgage was let in subject to the Barrett mortgage and the note of $185, by means of which the redemption was had; and, if so, whether, after the redemption was made, Alexander and Russell Grimes, and the Millers, could make the note held by Jacob Grimes on Russell, or the money paid for it by the Millers, a lien on the land, superior to that of the Pratt mortgage, or did the arrangement and redemption let that mortgage in absolutely, only subject to the amount used in effecting the redemption.

We have seen that Russell Grimes and Pratt's equity of redemption was barred and lost, and could only be revived by contract between the parties effecting the redemption. There is nothing appearing in the record from which it can be inferred that either of the parties was acting for Pratt, or intentionally did anything for his benefit, or to revive his mortgage as a lien junior to the advances made to redeem. Russell and Pratt's rights, then, being barred, the property became freed from Pratt's mortgage as to all persons but Russell. The Millers were at liberty to deal in the property then as they might choose. They were under no equitable

or moral obligation to protect Pratt's rights. Their relations were not such as to impose any such duty. But nevertheless, when Russell obtained the right to redeem, that, by operation of law revived Pratt's mortgage, subject to the lien of the Millers for the money advanced to redeem from Morrill's purchase; and they, without Pratt's consent, could not postpone his mortgage to the amount paid Jacob Grimes by the Millers.

As to the Pratt mortgage, Russell Grimes had used the terms "grant, bargain and sell" in it, and they operate as a covenant, under the provisions of the eighth section of the Conveyance act, to Pratt, his heirs and legal representatives, that he was seized, etc., in fee simple, free from incumbrances, etc. And it has been held that under this statutory covenant a subsequently acquired title by the grantor inures to the grantee so as to preclude its assertion by the grantor, his heirs or assigns. See *D' Wolf* v. *Haydn*, 24 Ill. 525; *King* v. *Gilson*, 32 id. 348; *Gochenour* v. *Mowry*, 33 id. 331; *Wadhams* v. *Gay*, 73 id. 415. In *D' Wolf* v. *Haydn*, *supra*, it was held the subsequently acquired title inured under such a covenant in a mortgage, to the benefit of the mortgagee. Here, Russell Grimes contracted for and procured the right of redemption, and it inured to Pratt's benefit, and, as between them, it revived the mortgage, subject to the Millers' advances to redeem, and to their advances of money to protect the title against the tax sale.

Equity follows the law, and when Russell Grimes procured the right to redeem, equity will treat it as a revival of the equity of redemption cut off and barred by Morrill's sale. And in analogy to the inuring of a subsequently acquired legal title at law under covenants for title, as soon as Russell acquired the right to redeem under his covenants in P. B. Pratt's mortgage, it inured to him and revived his right to redeem or purchase, subject to the claim of the Millers for the money they had advanced to redeem. His rights were such that he could then have filed a bill and foreclosed, and had the property sold, and had the proceeds applied, first, to

the claim of the Millers, and, after its satisfaction, the balance applied to the satisfaction of his mortgage. These were his equitable rights as they then existed. Nor had Russell and Alexander Grimes and the Millers any power without his assent to change or impair them.

It then follows that the subsequent arrangement between all of these parties but P. B. Pratt, that the Millers should pay the note held by Jacob Grimes on Russell Grimes, and hold a lien on the land for the money so advanced, did not affect or impair the lien of P. B. Pratt's mortgage, as he never assented thereto. It became a lien, but postponed and subject to that mortgage.

Pratt's mortgage was on record, and the Millers must be held to have had notice of the covenants it contained, and to have known the effect of the right they were conferring on Russell to redeem; and they were thereby estopped from claiming that the money advanced to pay the Jacob Grimes note was a lien superior to Pratt's mortgage. The rights of the parties, then, are that the Millers have a first lien on the lands for the $185 note, and the $1342.66 advanced to redeem, with interest on both sums; also, the necessary sum paid to preserve the premises from a tax title, with interest. Mrs. Pratt has a second lien on the land for any balance that may be due on her mortgage, with interest, and taxes paid, if any, deducting rents and profits, if any, received by her; and the Millers have a third and last lien on this land for the money paid to take up the note Jacob Grimes held on Russell Grimes, with accrued interest on the same.

Did the agreement of the Millers to convey to Mrs. Pratt, on her paying to the Millers $4080.48, of the 2d of August, 1872, produce any change in his rights under the Pratt mortgage? She most emphatically denies that she ever authorized Russell to make any such purchase or agreement, or that she ever ratified it or ever knew of its existence for a long period of time after its execution. And in this she is fully corroborated by Russell. Nor is their evidence overcome by other

testimony in the record. Had she authorized or assented to this agreement it may be it would have let in the lien for the money paid on the Jacob Grimes note as a prior lien and postponed the Pratt mortgage. But she did not authorize or sanction the arrangement either expressly or by implication, and her rights were not affected thereby.

We are unable to see that the case of *Hickox* v. *Greenwood* 94 Ill. 266, has any bearing on this case. There, Hickox's first lien had always been in force. It had not been barred, foreclosed or postponed; but in this case Pratt's mortgage was barred by failing to redeem. In that case, until Hickox's lien was barred, others could not postpone his lien for the purchase money without his assent, but the mechanic's lien, which was superior to a subsequent loan by Hickox to the purchaser, was superior to the lien created by the loan. But his lien for purchase money was superior to all other incumbrances. Had it been held that the mechanic's lien when it attached cut off Hickox's vendor's lien, then, if governed by such a ruling, we would hold that when Russell revived the lien of the Pratt mortgage, that cut off the prior liens of the Millers. But that case announces no such rule. Had Pratt's mortgage not been barred when the Millers made the advance of the note on Russell, *Hickox's case* would have been in point. But it lacks that essential element to make the two cases alike. Pratt had lost all lien on the land, and when it was revived it was subject to all previous and intermediate liens.

We now come to consider the question whether the evidence shows that the mortgage given by Russell Grimes to P. B. Pratt was made to hinder and delay creditors. The notes and mortgage being fair on their face, the presumption is that they are valid and binding until that presumption is overcome by satisfactory proof. To create a mere suspicion of fraud is not sufficient, but if it exists, it must be satisfactorily shown. The policy of the law is opposed to overturning solemn written instruments and deeds and conveyances

on slight evidence. The law designs that such instruments shall stand until overcome by evidence that convinces the understanding that they have been entered into for a purpose that is prohibited by the law. Whilst courts are vigilant in relieving against fraud, they are careful to protect fair and honest transactions.

On the mere production, then, of the notes and mortgage, the presumption is that they are valid, and it devolves upon those challenging their validity to impeach their fairness. James Pratt alleges that this mortgage and these notes were contrived to hinder, delay and defraud creditors. Much and very contradictory evidence was heard on the question. Whilst the commencement of James Pratt's suit was prior in date to P. B. Pratt's mortgage, his recovery of a decree was several years afterwards. The suit was brought nearly ten years before, and the decree rendered about that period after the suit was instituted. It is therefore almost certain that this mortgage was not made with a view of defrauding James Pratt, as Russell subsequently to its execution bought and sold property and continued in business as he had previously. James Pratt swears to admissions made by Mrs. Pratt, which she positively denies. He testifies that she admitted or stated to him that the mortgage was satisfied, and this statement was made by her on several occasions. But she unqualifiedly denies that she ever made such statements at any time. The force of his testimony is greatly impaired, from the fact that on his cross-examination in this case he admits that when the case was previously tried, he had not testified to these statements. With a person of his evident intelligence, and when his pecuniary interest was so largely involved, it is almost inconceivable that if it was true she had made such vital admissions, he should have withheld them. He must have known that if true, the case would turn on establishing this fact. Nor does he give any satisfactory explanation for withholding the evidence. If it was true, and knowing, as any one would have done, that they in all probability would con-

trol the issue, we can not suppose that he could have forgotten these facts.

His testimony as to Philemon's admissions in his lifetime can not be considered as evidence in determining this question, as they are not legitimate testimony, after Philemon's death, against his administratrix. If he has made out his case it must be by other evidence than these supposed admissions. Langdon Miller testified a number of times in favor of James Pratt, and that in various conversations which he had with Mrs. Pratt she made no claim to the land, nor did she speak of this mortgage until some time afterward. This witness also testifies that he received a fraudulent deed from Russell, and went through a mere sham of paying for it in the presence of a witness called to see the transaction.

Nor does it appear that Mrs. Pratt, on the occasions referred to by Miller, was under any legal or moral duty to assert her claims or speak of the mortgage. She was not required to proclaim the fact at all times and to all persons when conversing with her, even about the affairs of her husband's estate. The mortgage was on record and apparently unsatisfied, and that asserted to him and all other persons that she held the claim as representative of the estate. But according to his own testimony she did afterward assert it to him.

Again, Mrs. Pratt flatly contradicts Miller in almost every material portion of his evidence that seems to oppose her claim. And her evidence is corroborated in several material facts.

The evidence of Russell Grimes, William Pratt and Mrs. Pratt is that there was a valuable and large consideration for the notes to Philemon, to secure which the mortgage was given, and they specify the items constituting the indebtedness. They substantially agree as to what they were, as nearly so as could be expected after the lapse of about fifteen years. Had they precisely agreed in all of the particulars and minute details, the evidence would not perhaps be entitled to an equal degree of weight. We are clearly of

opinion that the evidence in support of the theory that the mortgage was fraudulent does not overcome this evidence, with the presumption that the mortgage is valid until impeached.

There is much evidence, inharmonious and contradictory in its character, but when it is all considered we think it is apparent, that all or the greater part of the business transacted between the parties, who were near relatives, was loosely done, relying on the memory of the parties and their disposition to act fairly. Mrs. Pratt was the sister of Russell Grimes, and as is frequent in such cases, there seem to have been liberties taken by him with her property, that he would not have done with that of a stranger or person less nearly related. It seems to be uncontradicted that on the death of their father she inherited means from his estate, and the money was drawn by Russell, and that he purchased with it real estate in his own name, a portion of which he subsequently conveyed to her, and on a settlement he, to secure a balance he owed her, gave her the notes and a deed of trust which was foreclosed by Smith's sale of the property which was purchased by Carpenter.

Russell Grimes seems to have been pressed for means and struggling to retrieve his impaired fortune for many years before he finally had to yield to his fate. Under such circumstances what more natural than that he should apply to a brother-in-law for assistance, or that the latter should, if able, lend him aid, and there is no evidence that P. B. Pratt was not abundantly able. All the evidence considered, we are, therefore, of opinion that James Pratt has failed to make a case of fraud.

As to the purchases by Worthington and Lyon, this mortgage was on record when they bought and received their conveyances. They were therefore chargeable with notice. Nor does the fact that Russell Grimes may have told them that it was satisfied, relieve them from its consequences. They should have applied to the holder of the mortgage to learn

the truth of the statement. Having failed to do so, they must bear the burthen imposed by their want of prudence.

All the evidence considered, we are of opinion that the circuit court erred in decreeing that the mortgage to P. B. Pratt was contrived with intent to defraud creditors of Russell Grimes,—and in decreeing the trust deed to Smith, and his deed to Carpenter, were void, as they were not parties to the suits or any of them,—and because the pleadings and evidence in this record were not sufficient to apply the Statute of Limitations to defeat that sale.

The decree of the Appellate Court must therefore, so far as it affirms the decree of the circuit court, be reversed, and the cause remanded, that proceedings may be had in conformity with this opinion.

*Decree reversed.*